IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  06-cv-02303-WYD-MJW

RALPH MERCADO,

        Plaintiff,

v.

M. BARBEE,
MARK MASER,
JO WADAS,
H. TRAPP,
R. CURRIN,
RALPH SMITH,
TIFFANY CRAWFORD,
LLOYD HARVEY,
JOHN DOE #1,
JOHN OR JANE DOE #2, and
JOHN DOE #3,

        Defendants.

---

**RECOMMENDATION ON
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Docket No. 161)
and
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 190)**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**

This case is before this court pursuant to an Order of Reference to Magistrate

Judge issued by Chief Judge Wiley Y. Daniel on April 18, 2008.  (Docket No. 63).

**PLAINTIFF'S ALLEGATIONS**

The pro se incarcerated plaintiff raised six claims in his First Amended Prisoner

2

Complaint (Docket No. 25), which was brought pursuant to 28 U.S.C. § 1331 and

Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388

(1971).  Pursuant to an Order Adopting and Affirming Magistrate Judge's

Recommendation issued by Chief Judge Daniel on February 23, 2009, certain claims,

including claims against four of the named defendants, were dismissed.  In addition,

plaintiff voluntarily dismissed his claims against defendant Hood.  (See Docket Nos. 164

and 166).  The following three claims remain:

**Claim 1.  Exposure to chemical fumes.**  On March 16, 2004, when defendants

Masar[1] and John Doe #1 of the ADX Facilities Department completed a work order by

removing and replacing a water heat exchanger in plaintiff's unit, chemical fumes were

released into the ventilation system that exposed plaintiff to an unreasonable risk of

serious damage to his health and safety.  These defendants showed deliberate

indifference toward plaintiff's medical needs by ignoring the safety requirements and

procedures when handling and disposing of propylene glycol when they poured it down

the floor drain.  Defendant Barbee had a duty to ensure that such a chemical exposure

does not occur and a duty to train and supervise all officers properly regarding

chemicals that pose a health or safety risk to ADX prisoners.

**Claim 2.  Denial of medical care.**  At about 10:05 a.m., on March 16, 2004,

plaintiff activated the panic button and informed the responding officer, defendant

Wadas, that plaintiff has asthma, that he had activated the button because of his

difficulty breathing due to the chemical fumes, and that he needed medical attention.

---

[1]This defendant's name is incorrectly spelled "Maser" on the First Amended
Complaint.

Wadas stated he informed the medical department of the plaintiff's medical emergency and told plaintiff he personally informed defendant H. Trapp of the plaintiff's medical emergency.  Trapp, an ADX nurse practitioner, failed to respond.

At around 10:35 a.m., defendants Currin[2] and Smith noticed plaintiff on his cell floor having difficulty breathing and questioned plaintiff's health.  Plaintiff notified them he was asthmatic and having serious difficulty breathing.  They stated they would call for a P.A.

Plaintiff, however, was denied medical care and left in his cell suffering an asthma attack, unable to communicate with prison staff because the panic button was not reset.  He went into complete respiratory failure and was unconscious on his cell floor for four hours.  None of the defendants who were notified about the emergency medical situation stayed with plaintiff until medical help arrived, reset his panic button, checked on his medical status, removed him to an unpolluted area, or ensured he received medical treatment.

Plaintiff now suffers from headaches, nose bleeds, leg numbness, difficulty sleeping, nightmares, cold chills, breathing problems, and a heart condition.

**Claim 3.  Conspiracy.**  Plaintiff's oxygen level on the day he attended a sick call was 92 percent, but during an investigation, an alteration was made on the records by defendant John or Jane Doe #2 such that the oxygen level was reported as 98 percent. This purportedly was another attempt to downplay the danger.

───────────────

[2]On November 12, 2009, a Suggestion of Death was filed by defense counsel pursuant to Fed. R. Civ. P. 25 which provided notice that defendant Russell Currin died on November 2, 2009.  (Docket No. 186).

4

**Claim 5.  Second denial of medical care.**  Plaintiff activated the panic button on April 17, 2006.  Defendant Crawford acknowledged the duress call.  Plaintiff informed her of his asthma and that he was having impaired breathing due to unknown fumes entering his cell.  Plaintiff requested immediate removal from his cell to an unpolluted area, which would have been the outside recreation area.  Crawford did not notify the medical department of the plaintiff's breathing difficulties.  Three other inmates tried to notify Crawford about the seriousness of plaintiff's condition.  Defendants Havery and John Doe #3 arrived on the range to return prisoners to their cells, ignored plaintiff's pleas for help, and left plaintiff suffering an asthma attack, which caused him to pass out.

Plaintiff seeks declaratory, injunctive, and monetary relief, including punitive damages.

A Final Pretrial Conference was conducted by this court on December 8, 2009 (Docket No. 201 - Courtroom Minutes/Minute Order), and a Final Pretrial Order has been filed (Docket No. 202).  The time to complete discovery and to amend pleadings has closed.

## MOTIONS FOR SUMMARY JUDGMENT

Now before the court for report and recommendation are the pro se plaintiff's Motion for Summary Judgment and Statement of Undisputed Facts (Docket Nos. 161 and 162) and the Defendants' Motion for Summary Judgment, which was filed by defendants Melvin Barbee, Lloyd Harvey, Mark Masar, Ralph Smith, Hysoim Trapp, and

5

Joseph Wadas.[3]  (Docket No. 190).  The court has carefully considered these motions,

the responses thereto (Docket Nos. 191 and 199), and the plaintiff's reply (Docket No.

195).  In addition, the court has considered its file and applicable Federal Rules of Civil

Procedure and case law.  The court now being fully informed makes the following

findings, conclusions, and recommendations.

Rule 56(c)(2) provides that summary judgment shall be granted "if the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c)(2).  "A party seeking summary judgment bears the

initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the pleadings, depositions, interrogatories, and admissions

on file together with affidavits, if any, which it believes demonstrate the absence of

genuine issues for trial."  Robertson v. Board of County Comm'rs of the County of

Morgan, 78 F. Supp.2d 1142, 1146 (D. Colo. 1999) (citing Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986); Mares v. ConAgra Poultry Co., 971 F.2d 492, 494 (10th Cir.

1992)).  "Once a properly supported summary judgment motion is made, the opposing

party may not rest on the allegations contained in the complaint, but must respond with

specific facts showing the existence of a genuine factual issue to be tried. . . .  These

facts may be shown 'by any of the kinds of evidentiary materials listed in Rule 56(c),

except the mere pleadings by themselves.'"  Southway v. Central Bank of Nigeria, 149

---

[3]See footnote 2 supra regarding defendant Currin.  In addition, defendant Crawford very recently filed a separate motion for summary judgment (Docket No. 205), which is not yet ripe for ruling.

6

F. Supp.2d 1268, 1273 (D. Colo. 2001), aff'd, 328 F.3d 1267 (10th Cir. 2003).

"Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response." Id. "The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . . Unsupported allegations without 'any significant probative evidence tending to support the complaint' are insufficient . . . as are conclusory assertions that factual disputes exist." Id.; Robertson, 78 F. Supp.2d at 1146 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); quoting White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995)). "Evidence presented must be based on more than 'mere speculation, conjecture, or surmise' to defeat a motion for summary judgment." Southway, 149 F. Supp.2d at 1274. "Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party." Id. at 1273.

Since the plaintiff is proceeding without counsel, his pleading has been construed liberally and held to a less stringent standard than formal documents drafted by lawyers. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)). Therefore, "if the court can reasonably read the pleadings to state a claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements. . . . At the same time, . . . it is [not] the proper function of the district court to assume the role of

advocate for the pro se litigant." Id.

**Claim One**

This court recommends that summary judgment be granted to the defendants on Claim One.  The undisputed facts shown do not approach the scope of Eighth Amendment protection articulated by the United States Supreme Court.  The Supreme Court has extended the Eighth Amendment's reach beyond punishments that are "physically barbarous." Rhodes v. Chapman, 452 U.S. 337, 345 (1981).  When a punishment is not alleged to be "physically barbarous," there must have been unnecessary and wanton infliction of pain.  Id. at 346.  The "unnecessary and wanton" standard includes punishments that are "so totally without penological justification" as to result in the "gratuitous infliction of suffering."  Gregg v. Georgia, 428 U.S. 153, 183 (1976).  When physical abuse is not alleged, the actions must represent more than an ordinary lack of due care for the prisoner's interest or safety.  Whitley v. Albers, 475 U.S. 312, 319 (1986).  "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." Id.  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." Id.

Furthermore, in conditions-of-confinement cases, the prisoner much establish "deliberate indifference" to the prisoner's health or safety.  Farmer v. Brennan, 511 U.S. 825 (1994).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.  "The Eight Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" Id.

Here, there has been no showing that there was more than an ordinary lack of due care by defendant Masar or that he was deliberately indifferent.  Masar was the Air Conditions Equipment Mechanic Supervisor at the United States Penitentiary, Administrative Maximum, on March 16, 2004.  Masar states the following in his Declaration (Docket No. 190-6).  On that date he replaced the heat exchanger in the HVAC system at the facility.  While doing that work, it was necessary to drain the heating water (approximately 25 gallons) out of the heat exchanger, which contained a "trace" amount of propylene glycol.  More specifically, the water contained less than one percent of propylene glycol, which was an amount that was not detectable upon testing.  When the water was so drained, because there was a trace amount of propylene glycol in it, it did create a slight odor which was present for only approximately ten minutes.  Because the air handler was located in the same mechanical room, there may have been a small amount of propylene glycol odor that could have been vented into the range where the prisoners are housed.  The odor would have been due to the propylene glycol and the smell of the water that was contained in the closed-loop system.  That water would have had a metallic, non-toxic smell to it because it was contained in steel and copper pipes.  There were no special handling requirements because there were only trace amounts of propylene glycol in the water.  It was his understanding that propylene glycol is not harmful if trace amounts of the vapor are inhaled.  Prior to doing

9

this work, he was unaware of the need to take special precautions due to any prisoner's health condition. (Docket No. 190-6).

In his response to defendants' motion for summary judgment, plaintiff does not controvert Masar's statement that there was only a trace amount of the chemical in the water. In his statement of undisputed facts in support of his own motion for summary judgment, however, plaintiff contends that Masar's statement that the heating water loop had a <u>trace</u> amount of propylene glycol (Pl.'s Ex. A-2) is false. In support of such contention, plaintiff cites his exhibit A-3, which is a Material Safety Data Sheet concerning CSC Heat Transfer Fluid - Inhibited Propylene Glycol. (Docket No. 162 at 14). That document, however, does not establish the amount of Propylene Glycol that was present in the water drained by Masar. It does not contradict Masar's statement that there was a trace amount of the chemical in the water, and as a result, there were no special handling requirements. Plaintiff has produced nothing to show that the release was not very limited in quantity. In addition, there has been no showing that contradicts Masar's statement that he had no prior contact with the plaintiff and was unaware that plaintiff, with his respiratory conditions, was present on the unit when the work was done and thus that Masar knew that the release of the trace amount could have posed a serious threat to the plaintiff.

Based on the above, this court cannot find as a matter of law that Masar's draining of such fluid involved more than ordinary lack of due care for the prisoner's interests or safety. Furthermore, there has been no showing that Masar was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that he also drew such inference.

10

In Claim One, plaintiff also asserts that defendant Barbee had a duty to ensure that such a chemical exposure does not occur and a duty to train and supervise all officers properly regarding chemicals that pose a health or safety risk to ADX prisoners. There is no evidence, however, of any deliberate indifference by Barbee.  At the time of the incident in question in Claim One, Barbee was a Safety Specialist at the United States Florence Correctional Complex.  (Docket No. 190-4 at ¶ 1).  Plaintiff did not see Barbee at the ADX on that day and has no personal knowledge or documentary evidence that Barbee even knew the heat exchanger was going to be replaced that day. (Docket No. 190-2; Pl.'s dep. at 61-62).  In addition, Barbee states in his Declaration that he did not have any knowledge that the heat exchanger units would be replaced in the ADX on March 16, 2004, he was not involved in the work done on the heat exchanger that day, he was not present in the area where the heat exchanger was being replaced, and he was not aware of any release of fumes that allegedly occurred that day. (Docket No. 190-4 at ¶¶ 7-10).  Furthermore, Barbee states that he has no specific recollection of the plaintiff, was not aware that plaintiff had a medical condition that affected his breathing, and was not aware that plaintiff was experiencing a serious medical condition for which he needed treatment.  (Docket No. 190-4 at ¶¶ 11-13).  In addition, he did not have any responsibility for supervising the Facilities Department to which defendant Masar was assigned.  (Docket No. 190- at ¶ 15).

Plaintiff has not shown any personal involvement by defendant Barbee in any alleged constitutional violation.  "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."  Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997).  "Because vicarious liability is inapplicable to . . . § 1983

11

suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009).

Based upon the findings above, this court recommends that defendants' motion for summary judgment be granted with respect to Claim One.

### Claims Two and Five: Denial/Delay of Medical Care

"[P]risoners have an Eighth Amendment right to adequate medical care . . . ." Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001).  "In keeping with the principle that government officials are generally afforded wide latitude when fulfilling their discretionary functions, . . . however, in cases where prisoners allege that inadequate or delayed medical care violated their Eighth Amendment rights, it has been established that '[p]rison officials violate the Eighth Amendment [only] when they are deliberately indifferent to the serious medical needs of prisoners in their custody.'" Id.  However, "a delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm. . . .  The substantial harm may be satisfied by lifelong handicap, permanent loss, or considerable pain." Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005) (quotations omitted).

"The test for constitutional liability of prison officials 'involves both an objective and a subjective component.'" Id.  As the Tenth Circuit has explained:

> to properly set forth an Eighth Amendment claim on which relief may be granted, [the prisoner] must set forth facts demonstrating [1] that his alleged medical need . . . was sufficiently serious to meet the objective element of the deliberate indifference test, and [2] that the Defendants' delay in meeting that need caused him substantial harm. . . .  Finally, to meet the subjective element of the deliberate indifference test, [the prisoner] must allege facts supporting an inference [3] that Defendants

12

knew about and disregarded a substantial risk of harm to his health or safety.

Oxendine v. Kaplan, 241 F.3d at 1276-77 (quotations omitted).

In this case, this court finds that there is a genuine issue of material fact with respect to whether defendants Wadas, Trapp, Smith, and Harvey were deliberately indifferent to plaintiff's alleged need for immediate medical care.

Wadas.  With regard to defendant Wadas, plaintiff asserts that on March 16, 2004, plaintiff activated the panic button and informed Wadas, the responding officer, that plaintiff has asthma, had activated the button because of his difficulty breathing due to the chemical fumes, and needed medical attention.  According to plaintiff, Wadas stated he informed the medical department of the plaintiff's medical emergency and told plaintiff he personally informed defendant H. Trapp of the plaintiff's medical emergency.

Wadas, however, states the following in his Declaration.  At the time of the alleged incident, he was working in the "Echo Control" (the "bubble"), and he was not able to leave the control center without being relieved by another staff member.  He was not able to see into the cells from the control center.  He does recall that plaintiff pressed his duress button and stated that he was having a difficult time breathing, and Wadas thus asked that Officer Russell Currin and another officer respond to plaintiff's cell.  Those officers advised Wadas that the medical department should be notified but that it was not an emergency but a routine request.  Wadas states that if it was an emergency, the officers would have activated their body alarms and summoned assistance immediately.  In addition, if he had been told that it was an emergency, Wadas could have also activated an emergency request and summoned help

immediately.  Wadas was not given information either by plaintiff or the officers that the plaintiff was suffering from a medical emergency, and after Wadas contacted the medical department and informed the staff member of the report from the officers, he was told that plaintiff's condition did not warrant immediate attention.  After being so informed, Wadas told plaintiff that Wadas had contacted the medical department.  At that point, Wadas did not believe plaintiff needed any further medical assistance.  In addition, Wadas notes that if plaintiff activated his duress button at approximately 10 a.m., he would have been served lunch at approximately 10:30 to 11:00 a.m.  In the process of serving him lunch, the officers distributing lunch would have had an opportunity to observe plaintiff's condition, and one or more officers would have observed him when the food trays were picked up after lunch.  Wadas further states that plaintiff did not make any further requests for assistance the remainder of that day.  He did not witness plaintiff in a medically distressed condition that day, nor did he witness any staff members fail to provide plaintiff with medical assistance due to a medical emergency.

Plaintiff, however, has submitted a document entitled "RESPONSE TO INMATE REQUEST TO STAFF MEMBER" from AHSA B. Greenwood who was the Acting HSA on March 16, 2004.  Greenwood states in that document that neither Greenwood nor Ms. Gladbach, the duty provider that day, was contacted regarding plaintiff's medical concerns.  (Docket No. 162 at 33).  Greenwood further states:

> I am truly concerned about this situation but have been unable to find out who states we were notified or when.  **I had the unit log book copied and sent to me to find who called this department.  I found no entries for that day regarding your concerns.**  Please know I take your issue very seriously and share your concern.  I can only ask that in the future

you not be so polite.  If you have such an attack and are not seen by
medical staff in a reasonable time, please press your duress button again.

Mr. Mercado, be assure we don't show up to work everyday to ignore
patient healthcare.  Issues such as yours are exactly why we are here.  I
know my response likely provides you with no answers, it is simply all I
have.

(Docket No. 162 at 33) (emphasis added).  In addition, plaintiff repeats his factual

claims regarding Wadas in his Declaration filed with his summary judgment motion.

(Docket No. 161-2 at 2, ¶ 4).

Based upon the conflicting statements detailed above concerning whether

defendant Wadas sought medical attention for the plaintiff during plaintiff's alleged

attack, this court finds that there is a genuine issue of material fact with regard to

plaintiff's claim against Wadas that precludes the entry of summary judgment for either

plaintiff or the defendant on this claim.

Trapp.  With regard to defendant Trapp, plaintiff asserts in his First Amended

Complaint and in his Declaration submitted with his motion for summary judgment

(Docket No. 161-2 at 2, ¶ 4) that Wadas stated that he informed Trapp, an ADX nurse

practitioner, of the plaintiff's medical emergency. Nevertheless, Trapp allegedly failed to

respond.

In her Declaration (Docket No. 190-8), Hyosim Trapp (now known as Hyosim

Seon-Spada) states that she was not in the institution on March 16, 2004, because she

was on annual training during the week of March 15-18, 2004.  In addition, during 2004,

she was assigned to the H Unit and did not regularly have contact with inmates in other

units, such as E Unit.  She does not have a recollection of having treated plaintiff or who

he is.  If she had been notified that plaintiff was having breathing problems, she would

have responded to his cell to determine the nature of his complaint and to provide treatment. She does not, however, recall receiving notification to respond to plaintiff's cell on March 16, 2004, or on any other date. Her review of plaintiff's medical records for the time period in question do not show a note made by her that she was notified or saw plaintiff. Her practice was to respond to any requests for medical assistance made by prison staff, including those from the unit control center ("bubble"). At no time has she failed to respond to an inmate's request for medical care. She was not aware of any release of propylene glycol fumes at the ADX on March 16, 2004.

In response, plaintiff claims that defendant Trapp committed perjury by stating she was not working at ADX on March 16, 2004, because co-defendant Wadas had stated in his response to plaintiff's Interrogatory No. 9 that he notified P.A. Trapp on March 16, 2004. (Docket No. 195-2 at 9).

Based upon the conflicting statements detailed above concerning whether defendant Trapp was notified about the plaintiff's condition, this court finds that there is a genuine issue of material fact with regard to plaintiff's claim against Trapp that precludes the entry of summary judgment for either plaintiff or the defendant on this claim.

Smith. With regard to defendant Smith, plaintiff asserts in his First Amended Complaint and in his Declaration filed with his summary judgment motion (Docket No. 161-2 at 2-3, ¶ 5) that on the morning of March 16, Smith (along with defendant Currin) noticed plaintiff on his cell floor having difficulty breathing and questioned plaintiff's health. Plaintiff notified them he was asthmatic and having serious difficulty breathing. They stated they would call for a P.A., but Smith left plaintiff there suffering an asthma

16

attack, did not check on his status, and did not ensure that he received medical treatment.

In his Declaration (Docket No. 190-7), Ralph Smith states that on March 16, 2004, he worked from 6:00 a.m. until 9:30 a.m., after which he went home due to a back problem.  He knows plaintiff based on Smith's interactions as an Education Technician. He is not aware of any medical condition plaintiff has or may have had.  He does not recall seeing plaintiff on March 16, 2004, lying down on the floor of his cell or in any other kind of physical distress.  Furthermore, he does not recall having any contact with plaintiff on account of any health-related problem or concern at any time.  If he had noticed plaintiff was in need of medical assistance at some point, he would have contacted the medical department to provide plaintiff assistance.  Smith has never witnessed any other Bureau of Prison staff member fail to provide medical assistance to plaintiff.  Smith is not trained to provide medical assistance other than first aid or CPR.

Plaintiff, however, has submitted a statement by another prisoner in which it is stated that Currin and R. Smith responded to plaintiff's cell that day and that after they departed, nobody from the medical department came to see the plaintiff.  (Docket No. 162 at 26, Pl.'s Ex. A-12).

Based upon these conflicting statements, this court finds that there is a genuine issue of material fact with respect to plaintiff's claim against defendant Smith that precludes the entry of summary judgment for either plaintiff or the defendant on this claim.

Harvey.  Plaintiff claims that after he activated the panic button on April 17, 2006, and informed defendant Crawford of his asthma and impaired breathing, defendant

Harvey (along with John Doe #3) arrived on the range to return prisoners to their cells, ignored plaintiff's pleas for help, and left plaintiff suffering an asthma attack, which caused him to pass out.

In his Declaration (Docket No. 190-5), however, Harvey states that he does not specifically recall who plaintiff is, although he may have had interaction with plaintiff at the ADX.  Harvey does not recall whether he worked on April 17, 2006, does not recall specifically seeing plaintiff in a medically distressed condition, but he does recall one time when an ADX inmate was having an asthma attack, and Harvey moved the inmate outside to a recreation cage in order for him to get fresh air.  At no time has he ever witnessed an inmate having a medical problem and not requesting medical assistance for him and at no time did he fail to remove an inmate from his cell who requested to be removed due to problems breathing and the need to get fresh air.  Harvey has no medical education or experience other than CPR training.

Plaintiff's Declaration filed with his summary judgment motion, however, repeats his factual claims against Harvey.  (Docket No. 161-2 at 3, ¶ 7).

Based upon the conflicting statements detailed above, this court finds that there is a genuine issue of material fact with respect to plaintiff's claim against defendant Harvey that precludes the entry of summary judgment for either the plaintiff or the defendant on this claim.

**JOHN DOE DEFENDANTS**

Plaintiff makes a claim against John Doe #1 in Claim One, against John or Jane Doe #2 in Claim Three, and against John Doe #3 in Claim Five.  The time to amend pleadings and to complete discovery, however, has closed, and plaintiff has not moved

to amend his pleading to identify these defendants.  Furthermore, plaintiff's § 1983

claims are governed by the two-year statute of limitations contained in § 13-80-102,

C.R.S.; Workman v. Jordan, 32 F.3d 475, 482 (10th Cir. 1994); Merrigan v. Affiliated

Bankshares of Colo., Inc., 775 F. Supp. 1408, 1411-12 (D. Colo. 1991).  More than two

years have passed since the date of the last alleged acts by the John/Jane Doe

defendants.  Therefore, the statute of limitations has run with respect to the John/Jane

Doe defendants.  It is thus recommended that the § 1983 claims against defendants

John Doe #1, John/Jane Doe #2, and John Doe #3 be dismissed *sua sponte*.  See

Fogle v. Pierson, 435 F.3d 1252, 1258 (10th Cir. 2006) ("A complaint may be dismissed

*sua sponte* under § 1915 based on an affirmative defense–such as statute of

limitations-'only when the defense is obvious from the face of the complaint and no

further factual record is required to be developed."), cert. denied, 549 U.S. 1059 (2006).

See also Garrett v. Fleming, 362 F.3d 692 (10th Cir. 2004) (Prisoner substitution of

named defendants for the original unknown "John Doe" defendants amounted to adding

a new party.  Complaint was dismissed as barred by applicable statute of limitations.

Rule 15(c)'s "relation back" provision because a plaintiff's lack of knowledge of the

intended defendant's identity is not a "mistake concerning the identity of the proper

party" within the meaning of Rule 15(c)(3)(B)."); Tapia-Ortiz v. Doe, 171 F.3d 150, 151-

52 (2d Cir. 1999) ("Although [plaintiff] filed his complaint naming defendant officers as

'John Does' within the . . . statute of limitations period, '[i]t is familiar law that "John Doe"

pleadings cannot be used to circumvent statutes of limitations because replacing a

"John Doe" with a named party in effect constitutes a change in the party sued.' . . .

And even when a suit is brought by *pro se* litigant, 'an amended complaint adding new

19

defendants [cannot] relate back if the newly-added defendants were not named

originally because the plaintiff did not know their identities.' . . . [Plaintiff's] failure until

two years after the expiration of the statute of limitations period to name specifically in

his complaint the officers who allegedly violated his rights is therefore fatal to his . . .

claim."); Shmueli v. City of New York, 2007 WL 1659210, *4 n.4 (S.D.N.Y. June 7,

2007) ("As the three-year statute of limitations has passed, and Plaintiff has not

effectuated service on "John Does 1-10," the Court, *sua sponte*, dismisses the "John

Doe" defendants, without leave to amend.").

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that the plaintiff's Motion for Summary Judgment (Docket No.

161) be denied.  It is further

**RECOMMENDED** that the plaintiff's claims against the John and Jane Doe

defendants be dismissed *sua sponte*.  It is further

**RECOMMENDED** that the Defendants' Motion for Summary Judgment, which

was filed by defendants Melvin Barbee, Lloyd Harvey, Mark Masar, Ralph Smith,

Hysoim Trapp, and Joseph Wadas (Docket No. 190), be granted in part and denied in

part.  More specifically, it is recommended that summary judgment be granted to

defendants Masar and Barbee.

If these recommendations are accepted, then the only claims remaining would be

Claims Two and Five.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2),**

**the parties have fourteen (14) days after service of this recommendation to serve**

20

and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).


Date:  January 4, 2010                          s/ Michael J. Watanabe
       Denver, Colorado                        Michael J. Watanabe
                                      United States Magistrate Judge